**WO**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

United States of America,
Plaintiff,
vs.
Dennis Eugene Hearron,
Defendant.

No. CR 91-392-2-TUC-CKJ

**ORDER**

Pending before the Court is the Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(I) filed by Dennis Eugene Hearron ("Hearron") (Doc. 922). This document was filed by assigned counsel and incorporates previous pro se filings by Hearron. *See* Motions for the Assignment of Counsel, Supplemental Motion for Sentence Reduction (Docs. 910, 911, 914).

*Background*

Hearron was convicted of conspiracy to possess and possession with intent to distribute marijuana and cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 and using a firearm in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c). *United States v. Hearron*, 9 F.3d 1554 (9th Cir. 1993), *unpublished*. On October 5, 1992, Hearron was sentenced to five (5) life terms of imprisonment, to run concurrently. Further, he was found to be a career offender, pursuant to U.S.S.G. § 4B1.1, based on two prior felony drug offenses in California. The Ninth Circuit affirmed Hearron's conviction.

On April 5, 2019, 82-year-old Hearron submitted an application under the First Step

Act to the Bureau of Prisons ("BOP); Hearron was denied relief.

Hearron now seeks compassionate release pursuant to Section 603(b)(1) of the First Step Act from this Court. Appointed counsel has filed a Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(I). (Doc. 922). The government has filed a response and Hearron has filed a reply. (Docs. 925, 926). An evidentiary hearing was held on June 3, 2020, and counsel submitted written oral arguments. (Docs. 948, 951, 953). Additionally, Hearron has submitted an Emergency Motion/Supplemental Authority for Defendant's Motion for Compassionate Release, a Notice of Exposure to COVID-19, and a Notice of Supplemental Authorities. (Docs. 931, 952, 954). Hearron argues his elevated risk of contracting COVID-19 from the SARS-CoV2 virus, commonly referred to as the coronavirus, is a further basis for compassionate release.

At the hearing, defense counsel stated that, in essence, Hearron was seeking to be resentenced to time served.

Billy Carson, a correctional counsel at FCI-Terre Haute, testified he sees Hearron daily and that Hearron does not appear to have any difficulty moving around the facility. Further, to the best of Mr. Carson's knowledge, Hearron does not need assistance in performing his activities of daily living (e.g., grooming, cleaning). Additionally, Hearron works in the library in the education department. Mr. Carson does not recall having ever received a written concern regarding medical issues from Hearron.

Mr. Carson also testified as to the new procedures that are being used in the facility in light of the coronavirus. At the time of the hearing, no coronavirus cases had been identified. Hearron has subsequently filed a Notice of Exposure to COVID-19 which indicates an officer, who had contact with inmates in Hearron's unit, has tested positive for COVID-19.

Elissa Booe, a case manger at the Terre Haute facility, testified she has been Hearron's case manager for approximately four months and has daily contact with Hearron. Ms. Booe has observed Hearron functioning very well in the facility. To her knowledge, Hearron does not use any type of device to get around. Further, Hearron is always clean and

well-groomed; to Ms. Booe's knowledge, Hearron does not need assistance with his grooming. Ms. Booe does not know of any other inmate in the unit older than Hearron.

On May 20, 2020, Ms. Booe conducted a pattern risk assessment of Hearron and scored him as a medium. This assesses an inmate's recidivism rate. In conducting this assessment, Ms. Booe looks at an inmate's age and history of violations, as well as educational level, programming, work status and any incident reports. Hearron's three most recent incident reports were in October 1992, November of 2009, and May of 2016.

Dr. Elizabeth Trueblood is Hearron's treating physician at FCI-Terre Haute; her oldest patient is 83. She testified that the 82-year-old Hearron has been diagnosed with the following major health conditions: heart failure, atrial fibrillation, renal insufficiency (stage 4), gout, and hypertension. Hearron also has an implanted pacemaker.[1]

As to Hearron's heart condition, Dr. Trueblood testified his heart failure has been managed: Hearron has a pacemaker which forces his heart to beat 60 beats per minute, takes medications, does not require oxygen and only sees the cardiologist approximately every six months. In March of 2019, Hearron had been admitted to the hospital for one to two days for bradycardia (low heart rate); Hearron's medicine was withheld from him for a short time and his heart returned to normal. As part of Hearron's heart condition, he sometimes suffers from dizzy spells, albeit not recently. Dr. Trueblood testified that, if needed, she could arrange for Hearron to see a cardiologist sooner than typically scheduled, modify Hearron's medication, or arrange for him to be admitted to the hospital.

As to Hearron's renal failure, Dr. Trueblood testified that, while Hearron's renal failure is optimally managed, Hearron will not get better. Hearron receives lab tests every few months to monitor his renal function. At some point, he may need dialysis; optional

---

[1]Dr. Trueblood was unable to testify when Hearron's pacemaker had been implanted. Hearron will require surgery when it needs to be replaced; this surgery is typically outpatient. A cardiologist can test a pacemaker to make sure it is functioning correctly. Additionally, a patient may suffer a dizzy spell or a pacemaker may beep or "fire," giving a patient a jolt, when a pacemaker is malfunctioning. In such circumstances, Dr. Trueblood sends the patient to the emergency room.

treatments can be provided through BOP. Treatment outside of the prison facility will not improve this condition.

Dr. Trueblood also testified that, although Hearron has been diagnosed with hypertension, he does not have a problem with elevated blood pressure. Additionally, Hearron is receiving medication for his gout, which reduces the inflammation and resolves the pain. Because Hearron's gout is on his hand, a gout flare-up would not affect his mobility. Dr. Trueblood also testified Hearron does not have diabetes or lung issues, nor does he use a walker or cane.

Dr. Trueblood testified Hearron is at an increased risk of COVID-19 due to his heart condition and age. However, given his age, he is relatively healthy. In fact, she treats 40-year-old persons who are in worse condition than Hearron. The only thing that has really declined is Hearron's renal function and that has been in the last year and a half. Although Hearron mentioned memory problems two-three years ago, Dr. Trueblood has not noticed any problems. Because Hearron had raised this issue, she set him up with psychology as well as neurology for a mini mental status review and a full neurologic evaluation. Hearron refused to complete either of these assessments. However, Dr. Trueblood testified Hearron is 100% compliant with taking his medications and does ask to reschedule appointments when he misses an appointment. She has not noticed any mental decline other than natural aging. Further, he looks like he takes care of himself, is typically clean and well groomed, does not have any issues that would prevent him from carrying on his activities of daily living, and has not requested any assistance for ambulatory issues.

Dr. Trueblood also testified as to the procedures used by the prison in light of the coronavirus. Additionally, when asked how quickly Hearron can see someone to address medical issues, Dr. Trueblood explained the process both before the coronavirus lockdown and after. Before the lockdown, sick call was four days a week at 7:30 and, without limit, Hearron could report himself. Hearron would be screened by the nursing staff initially and then the nurse practitioner would see Hearron. With the lockdown in place, a rapid triage process is used. Unless immediate attention is needed, inmates are advised they will get to

the medical department when allowed – Dr. Trueblood is only able to have inmates from one unit present at a time.

Hearron testified that he had three stints in his heart; although a doctor had attempted to place a fourth, he was unable to complete the procedure. He has had two inguinal hernia operations and some tumors have been surgically removed. Hearron also suffers from rheumatoid arthritis in both hands. He also has severe kidney problems and has had three episodes of dialysis. Hearron had a pacemaker implanted in 2002. He does not have a defibrillator and has a 30 to 35 percent ejection fraction in his heart. He suffers from chronic heart failure.

Hearron has also had cataract removal from his left eye and uses glasses. He has had total tooth removal and uses dentures. He suffers from hearing loss and memory loss with age. For the last three years he has suffered from incontinence. Hearron testified that, as he was testifying, he was unstable in balance. Hearron also has periodic tremors. He also stated he is anemic, short of breath, and frequently suffers from dizziness. Hearron cannot walk briskly and carry on a conversation without gasping for breath. Further, he has gout in both feet. The gout causes significant pain in the big joint and almost precludes walking. He cannot even walk fast – although the cafeteria is only about 180 feet from his cell, he is the last one there every time. When the gout is bad, Hearron does not even go to the cafeteria. Hearron has not requested a walker or cane; he does not think either would help him. It is not that he is unsure on his feet or about to fall down, but that he would become short of breath.

Hearron resides in a six by eight foot cell. Before the lockdown, Hearron would hardly go anywhere, although he would go to his job. He does not have a problem getting to the shower, although he has been knocked down by another inmate trying to get to the shower. Hearron never uses the stairs.

Hearron explained his last incident report as involving his possession of a scissors (assigned to him for his job); Hearron had left his job to attend a medical appointment and forgot he carried the scissors with him.

In light of the coronavirus, everyone is wearing masks (except in the cells). Sometimes officers and inmates forget, but wear a mask when reminded. In general, everyone complies with the mask requirement.

Jesus Alvaro Garcia, a litigation consultant as to prisons, jails, and correctional healthcare, testified regarding BOP. He started as a medical technologist with BOP and ultimately worked at a variety of positions with BOP including as an Assistant Regional Administrator Medical Services, Associate Warden, Warden, and served on a medical review team to conduct reviews of all of the medical facilities in BOP. He ended his career with BOP as a Senior Deputy Assistant Director, Health Services Division. Mr. Garcia oversaw, from an administrative and audit standpoint, that everything was being done according to regulations and standards of the quality of medical care as determined, at that time, by the Joint Commission and Accreditation of Health Care.

Although Mr. Garcia has been retired from BOP for 20 years, he has maintained contact with BOP officials. Additionally, he has been an adjunct professor in criminal justice program core courses. Mr. Garcia testified he stays current with changes and developments at BOP.

Mr. Garcia has reviewed the records of Hearron. He testified that Hearron is at a care level three. At this level, he needs access to all types of specialists, whether they are available at the institution or outside the facility. FCI-Terre Haute provides this level of care. The overriding concern raised in Hearron's medical records is that he suffers from cardio renal syndrome. However, FCI-Terre Haute does not provide any programming for geriatric patients. Additionally, the records indicate the nephrologist has become increasingly concerned about the life of Hearron's pacemaker. Mr. Garcia opined that Hearron would be at a care level four within the next year. At that point he will need nursing care rather than assisted care and will need to be designated to a federal medical center that provides care level four. Mr. Garcia attributes his difference of opinion from Dr. Trueblood (and Hearron's counselors), who testified Hearron was one of the healthiest 82 year olds she has seen, to the recent nephrology and neurology reports. Mr. Garcia also testified that the care Hearron

currently receives at BOP is comparable to the care he would received outside of the facility through the Veterans Administration. However, when Hearron reaches care level four, the care he would receive outside of BOP would surpass the care he receives at BOP.

As a prior warden, Mr. Garcia had an opportunity to review the policies in place for resentence and compassionate release. In reviewing Hearron's case, Mr. Garcia would consider Hearron's risk: Hearron is almost 83 years old, has completed more than 25 years of his sentence, his Class A felony was because he was a repeat offender – the underlying offenses would be considered less serious today. Mr. Garcia would consider Hearron a very low risk at this time. He compares this to the automatic "score" BOP would find which would be a high risk simply because Hearron received a life sentence. He would also consider Hearron's latest incident report, which, in context, was minor.

Additionally, Mr. Garcia testified that Hearron suffers from a loss of balance that goes with his age. Although Hearron has not requested a walker, the facility has not provided one to Hearron on its own. He points out that the other witnesses did not testify so much that Hearron gets around fine, but that they have limited opportunity to observe how Hearron gets around.

Hearron is now 82 years of age, with a date of birth of September 15, 1937, and has served approximately 30 years of his life sentence. Hearron is not able to socially distant (e.g., from his cellmate) in his cell.

*First Step Act and Compassionate Release*

The First Step Act went into effect on December 21, 2018. See First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. Prior to the passage of the First Step Act, only the Director of the Bureau of Prisons ("BOP") could file a motion for compassionate release. Section 603(b) of the First Step Act modified 18 U.S.C. § 3582(c)(1)(A) with the intent of "increasing the use and transparency of compassionate release." Pub. L. No. 115-391, 132 Stat. 5194, at *5239 (capitalization omitted). That section now provides that a sentencing court may modify a sentence either upon a motion of the Director of the BOP "or upon

motion of the defendant after [he] has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility . . . " 18 U.S.C. § 3582(c)(1)(A). This Court previously found Hearron had adequately exhausted his administrative remedies. *See* March 10, 2020, Order, pp. 3-4 (Doc. 927).

Additionally, under U.S.S.G. § 1B1.13, a reduction/release is not appropriate unless a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[,] and the reduction/release is consistent with the guideline policy statement.

Hearron moves for compassionate release pursuant to Section 3582(c)(1)(A)(I), which permits a sentencing court to grant such a motion where "extraordinary and compelling reasons warrant such a reduction" and the "reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . " The Application Notes of the U.S. Sentencing Guidelines § 1B1.13 provides, in relevant part, that extraordinary and compelling reasons exist:

> (A) Medical Condition of the Defendant.--
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is--
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.--The defendant (I) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

U.S.S.G. 1B1.13, App. Notes.

In exercising discretion under § 3553(a) and the First Step Act, compassionate release "due to a medical condition" is generally treated as "an extraordinary and rare event." *White v. United States*, 378 F.Supp.3d 784 ,787 (W.D. Mo. May 9, 2019); *see also United States v. Clark*, 2019 WL 1052020 (W.D.N.C. Mar. 5, 2019) (denying relief, which is "extraordinary"); *United States v. Gutierrez*, 2019 WL 1472320, at *2 (D.N.M. Apr. 3, 2019) (same); *United States v. Casey*, No. 1:06CR00071, 2019 WL 1987311, at *1 (W.D. Va. May 6, 2019) (same). Prisoners typically only obtain relief after serving a significant term of incarceration. *See, e.g., United States v. McGraw*, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019) (granting the motion and noting defendant already served "nearly 17 years, a significant sanction").

The evidence presented at the hearing establishes that Hearron suffers from a number of serious medical conditions and is experiencing deteriorating physical or mental health because of the aging process. U.S.S.G. 1B1.13.A., App. Notes. The Court considers whether these conditions substantially diminish the ability of Hearron to provide self-care within the environment of a correctional facility. Although Hearron argues he must compete for phone time, showers and food, Memorandum in Closing, p. 9 (Doc. 953), Hearron is still able to take care of his personal cleaning and grooming, including being able to access the shower by himself. Further, he is able to get himself to his employment and the cafeteria (pre-lockdown). Indeed, Mr. Carson and Ms. Booe testified that Hearron gets around quite well, although Mr. Carson pointed out that Hearron does not need to use the stairs. Further, Hearron is compliant with taking his medications, apparently without assistance. Additionally, Dr. Trueblood testified that Hearron, given his age, is actually relatively healthy and is one of her healthier inmates. Indeed, it appears BOP is currently able to be adequately address Hearron's medical conditions. However, Mr. Garcia opined that Hearron would need a nursing home environment level of care within the next year.

Hearron is 82 years old, i.e., at least 65 years old. He is experiencing a serious deterioration in physical or mental health because of the aging process and has served

approximately 30 years of his life sentence, i.e., at least 10 years or 75 percent of his term of imprisonment. U.S.S.G. 1B1.13(B), App. Notes. While the Court agrees with the government that Hearron's medical conditions are being well-managed within the BOP system, "it is evident [nonetheless] he is experiencing a serious deterioration in physical health as he ages." *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, * 2 (D. Idaho Apr. 7, 2020). Further, Hearron "is on the cusp of or is suffering from a serious physical or medical condition and is experiencing deteriorating physical or mental health because of the aging process that substantially diminishes his ability to provide self-care within the BOP and from which he is not expected to recover. U.S.S.G. 1B1.13.A., App. Notes." *United States v. Johns,* No. CR 91-392- TUC-CKJ, 2019 WL 2646663, at *3 (D. Ariz. June 27, 2019); *see also* U.S.S.G. 1B1.13 App. Note 1(A)(I) (examples of a serious and advanced illness with an end of life trajectory includes end-stage organ disease).

The Court in *Esparza* found that there were compelling justifications to grant petitioner's request based on his medical condition and the risk of COVID-19. However, the court concluded that it could not find Esparza was not a danger to the safety of any other person or the community. In this case, the government does not assert Hearron is a danger to himself or others in the community.

Factors to consider in determining whether a defendant is a danger to others or the community include the nature of the offense, the history and characteristics of the defendant, and the nature of the danger. U.S.S.G. § 1B1.13(2); *see also* 18 U.S.C. § 3142(g) factors. In light of Hearron's age, physical condition and the testimony of the witnesses, the Court finds Hearron is not a danger to the safety of any other person or to the community. *See* U.S.S.G. § 1B1.13(2), 18 U.S.C. § 3142(g). Moreover, any potential risk to the community can be managed by a term of supervised release, *see* 18 U.S.C. § 3142(g) (noting conditions of release can mitigate danger to the community). Further, Cheryl L. Clark, Hearron's daughter, is available to provide housing for Hearron; she discusses her willingness to pay for all expenses (e.g., housing, insurance, etc.), activities available to Hearron, and her ability

to ensure medical care for Hearron. June 7, 2016, letter (Doc. 910, pp. 30-32 of 42).[2] Similarly, Michelle Coleman, another daughter of Hearron, has expressed a willingness to have Hearron reside in her residence. A sentence reduction would, therefore, be consistent with Sentencing Commission policy. Further, it appears Hearron has a place to live with his daughter, who has been approved by the probation office as able to provide a suitable residence for Hearron. A sentence reduction is therefore consistent with Sentencing Commission policy.

Consideration of the § 3553(a) factors is also required for compassionate release. Although Hearron was classified as a career criminal and was in a criminal history category IV when sentenced, the Court recognizes that currently drug trafficking defendants are often sentenced to lower terms of incarceration than when Hearron was sentenced. In light of Hearron's medical condition and the length of sentence already served, the Court finds granting the request for compassionate release would still reflect the seriousness of the offenses, promote respect for the law, provide just punishment for the offenses, afford adequate deterrence to criminal conduct, and protect the public from further crimes of Hearron.

Compassionate release takes "on added weight because of the COVID-19 virus raging across the globe." *Esparza*, 2020 WL 1696084 at *2. Because of his age and medical conditions, Hearron is at a "more significant risk for severe and life-threatening illness." *United States v. Cosgrove*, — F.Supp.3d —, No. CR15-230-RSM, 2020 WL 1875509, at *5 (W.D. Wash. Apr. 15, 2020). "[D]espite BOP's best efforts, the virus [may] continue to breach prison walls[,]" *Esparza*, 2020 WL 1696084 at *3. *See e.g.*,BOP Implementing. Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp, BOP Program Statement No. 6190.04, Infectious Disease Management (June 3, 2014), https://www.bop.gov/policy/progstat/6190_004.pdf; BOP Health Services Division, Pandemic Infl. Plan (Oct. 2012), https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.

---

[2]A July 31, 2020, Updated Home Report has been provided to the Court.

Hearron has presented a "serious concern over the existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country[.]" *United States v. Hamman*, No. 3:16-CR-185-SI, 2020 WL 3047371, at *5 (D. Or. June 8, 2020). Indeed, Hearron has shown he is at an elevated risk to contract COVID-19.

Pursuant to 18 U.S.C. § 3582(c), the Court finds that extraordinary and compelling reasons warrant a reduction of Hearron's sentence, Hearron does not pose a danger to any other person or the community while on supervised release, the § 3553(a) factors support a reduction, and the reduction is consistent with the Sentencing Commission's policy statements. The Court finds it appropriate to grant Hearron's request for compassionate release.

Accordingly, IT IS ORDERED:

1. The Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(I) filed by Dennis Eugene Hearron (Docs. 910, 911, 914, 922, 931) is GRANTED.

2. Hearron's sentence of imprisonment is reduced to time served EFFECTIVE AUGUST 14, 2020, and the BOP shall release Hearron ON AUGUST 14, 2020, for placement with Cheryl L. Clark, in Yakima, Washington.

3. Hearron is placed on lifetime supervised release on all counts.

4. Hearron is responsible for arranging his own transportation to the residence of Cheryl L. Clark.

5. Within 72 hours of release from the custody of the Bureau of Prisons, Hearron shall report telephonically to United States Probation Officer Phil Casey at (509) 571-0724.

6. Hearron's conditions of supervised release are imposed as follows:

IT IS ORDERED while on supervised release, Hearron must comply with the mandatory and standard conditions of supervision. Of particular importance, the defendant must not commit another federal, state, or local crime during the term of supervision. Hearron must comply with the following conditions:

MANDATORY CONDITIONS

1) You must not commit another federal, state or local crime.

2) You must not unlawfully possess a controlled substance. The use or possession of marijuana, even with a physician's certification, is not permitted.

3) You must refrain from any unlawful use of a controlled substance. The use or possession of marijuana, even with a physician's certification, is not permitted. Unless suspended by the Court, you must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

STANDARD CONDITIONS

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of sentencing or your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4) You must answer truthfully the questions asked by your probation officer.

5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected

6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by

the conditions of your supervision that he or she observes in plain view.

7) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

8) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

9) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

10) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

11) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

12) You must follow the instructions of the probation officer related to the conditions of supervision.

SPECIAL CONDITIONS

The following special conditions are in addition to the conditions of supervised release or supersede any related standard condition:

1) You must cooperate in the collection of DNA as directed by the probation officer.

2) You shall submit your person, residence, office, or vehicle to a search, conducted by a U.S. probation officer, at a sensible time and manner, based upon reasonable suspicion of contraband or evidence of violation of a condition of supervision. Failure to submit to search may be grounds for revocation. You shall warn persons

with whom you share a residence that the premises may be subject to search.

3) You shall undergo a substance abuse evaluation and, if indicated by a licensed/certified treatment provider, enter into and successfully complete an approved substance abuse treatment program, which could include inpatient treatment and aftercare. You shall contribute to the cost of treatment according to your ability to pay. You shall allow full reciprocal disclosure between the supervising officer and treatment provider. As directed by a U.S. probation officer.

4) You shall abstain from the use of illegal controlled substances, and shall submit to testing (which may include urinalysis or sweat patch), as directed by the supervising officer, but no more than six tests per month, in order to confirm continued abstinence from these substances.

The Court may change the conditions of supervised release or extend the term of supervision, if less than the authorized maximum, at any time during the period of supervised release. The Court may issue a warrant and revoke the original or any subsequent sentence for a violation occurring during the period of supervised release.

DATED this 6th day of August, 2020.

Cindy K. Jorgenson
United States District Judge